# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JANE DOE 1,

       Plaintiff,

v.                                                                    25-CV-2113 (JMF)

ALON ALEXANDER, OREN
ALEXANDER, and TAL ALEXANDER,

       Defendants.

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE SCANDALOUS ALLEGATIONS FROM THE COMPLAINT

**GRUENBERG KELLY DELLA**
Michael DellaUniversita, Esq.
700 Koehler Avenue
Ronkonkoma, New York 11779
631-737-4110
*Counsel for Plaintiff*

1
2

### TABLE OF CONTENTS

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF AUTHORITIES ............................................................................................ 3

FACTUAL BACKGROUND ......................................................................................... 5

ARGUMENT ................................................................................................................ 7

    I.    THE MOVING DEFENDANTS' MOTION TO DISMISS
        SHOULD BE DENIED ..................................................................................... 7

        A.    Legal Standard ........................................................................... 7

        B.    The Victims of Gender-Motivated Violence Protection
              Law .............................................................................................. 8

        C.    The Child Victims Act and Adult Survivors Act ......................... 9

        D.    The VGMVPL Revival Provision Is a Lawful Exercise of
              Local Authority and Is Not Preempted by the CVA or
              ASA ........................................................................................... 11

    II.    THE MOVING DEFENDANTS' MOTION TO STRIKE
        SHOULD BE DENIED ................................................................................... 17

        B.    The Challenged Allegations Are Admissible and Highly
              Relevant .................................................................................... 19

CONCLUSION .......................................................................................................... 20

# TABLE OF AUTHORITIES

### Cases

Ashcroft v Iqbal, 556 U.S. 662 (2009)................................................................ 7

Bell Atl, Corp. v. Twombly, 550 U.S. 544 (2007) ......................................... 7

Carroll v. Trump, 660 F. Supp. 3d 196, 201 (S.D.N.Y. 2023). ................................ 17

Center for Independence of the Disabled v. Metropolitan Transp. Auth., 184 A.D.3d 197 (1st Dep't 2020). ................................................................ 13

Consolidated Edison Co. v. Town of Red Hook, 60 N.Y.2d 99, 105–06 (1983)..... 11

Diesel Props S.R.L. v. Greystone Bus. Credit II LLC, No. 07 Civ 9580 (HB), 2008 WL 4833001, at *4 (S.D.N.Y. Nov. 5, 2008).................................................. 17

Doe v. Black, 2024 U.S. Dist. LEXIS 175929, *20 (S.D.N.Y. 2024)..................... 11

Eckhart v. Fox News Network, LLC, No. 20 Civ 5593 (RA), 2021 WL 4124616, at *26 (S.D.N.Y. Sept. 9, 2021)........................................................ 17

Engelman v. Rofe, 194 A.D.3d 26 (1st Dep't 2021)............................................ 15

Galper v. JP Morgan Chase Bank, N.A., 802 F.3d 437 (2d Cir. 2015) ..................... 7

Goldstein v Pataki, 516 F.3d 50, 56 (2d Cir. 2008)........................................... 6

Hertz Corp. v. City of New York, 80 N.Y.2d 565 (1992) ..................................... 12

In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76 (S.D.N.Y. 2003)................................................................ 16

Lipsky v. Commonwealth United Corp., 551 F.2d 887 (2d Cir. 1976)................... 17

New York State Club Ass'n v. City of New York, 69 N.Y.2d 211, 221 (1987)...... 13

Parker v. Alexander, 2025 U.S. Dist. LEXIS 11582 (S.D.N.Y. Jan. 22, 2025) ....... 12

Police Benevolent Assn. of the City of New York, Inc. v. City of New York, 40 N.Y.3d 417 (2023)................................................................ 11

Roe v. City of N.Y., 151 F. Supp. 2d 495 (S.D.N.Y. 2001)................................... 16

See People v. Torres, 37 N.Y.3d 256 (2021)........................................... 13

Sloup v. Loeffler, No. 05 Civ 1766 (JFB) (JO), 2006 WL 767869, at *3 (E.D.N.Y. Mar. 13, 2006)................................................................ 17

United States v. Morrison, 529 U.S. 598 (2000) ........................................... 7

Winfield v. Citibank, N.A., No. 10 Civ 7304 (JGK), 2012 WL 266887, at 9

(S.D.N.Y. Jan. 30, 2012)..................................................................................... 16

Statutes

CPLR § 214-g............................................................................................................ 9

CPLR § 214-j ............................................................................................................ 9

N.Y.C. Admin Code. § 10-1102 ............................................................................ 7

Rules

Rule 12(b)(6) ............................................................................................................. 6

1
2

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND MOTION TO STRIKE SCANDALOUS ALLEGATIONS FROM THE COMPLAINT

3
4
5
6
7
8
9
10
11

Plaintiff Jane Doe 1 ("Plaintiff"), by and through her undersigned counsel, Gruenberg Kelly Della, respectfully submits this Memorandum of Law in opposition to the Motion to Dismiss the Complaint and to Strike Scandalous Allegations from the Complaint filed by Defendants Alon Alexander ("Alon"), Oren Alexander ("Oren"), and Tal Alexander ("Oren") (collectively, "the Defendants"). For the following reasons, Plaintiff respectfully requests that the Moving Defendants' motion be denied in its entirety. A proposed order is attached to the Declaration of Michael DellaUniversita ("Della Decl.") as Exhibit A.

12

### FACTUAL BACKGROUND

13
14
15
16

Defendants' motions to dismiss the Plaintiff's Complaint amount to a deficient attempt to evade responsibility by mischaracterizing the facts of the case. Plaintiff's claims are substantiated by her traumatic lived experiences, vigilant corroboration, and a complaint that fulfills all necessary legal standards. The motions should be denied in their entirety.

17
18
19
20
21

As detailed in Plaintiff's Complaint, attached hereto as Exhibit B, Plaintiff's life took a dramatic and horrific turn in 2016 when she was only 20 years old. Responding to an Instagram story by prominent celebrity DJ Chantel Jeffries, which sought someone to go on a date with a "rich handsome guy" in New York City, Plaintiff subsequently found herself in a perilous situation.

22
23
24
25
26

Plaintiff's initially communicated with Defendant, Alon, conveying that she wanted to set Plaintiff up with a family-oriented" man for a long-term relationship. What followed was a systemic process executed by Alon, who reached out to Plaintiff under the guise of genuine interest, eventually manipulating her perception of trust.

27
28

Alon invited Plaintiff to Manhattan for dinner, yet upon her arrival, it became evident that no such restaurant existed at the location. Instead, with deceptive charm. Instead, with deceptive

charm, Alon redirected Plaintiff to his penthouse apartment under false pretenses, claiming that they would dine afterward. Upon reaching his apartment building, Plaintiff had to surrender her identification for entry – a part of Alon's predatory scheme.

Once inside the apartment, Alon presented Plaintiff with a prepared drink – a critical component of his methodical assault pattern. After consuming only a part of the drink, Plaintiff began to feel disoriented, far beyond the effects of normal alcohol consumption, indicating that she had likely been drugged. Her subsequent memories fragmented, she recalls walking in a vulnerable position that would lead to an act of sexual violence.

Alon's strategy continued as he manipulated the environment. With another brother, Oren, in the apartment, Alon solidified his predatory scheme of coercion and control. Throughout the ordeal, Plaintiff consistently resisted Alon's advances, verbally and physically asserting her non-consent. Yet, despite her verbal refusals and physical struggle, Alon forcibly restrained her and initiated sexual acts, violating her bodily autonomy.

As the assault unfolded, Oren also joined in the attack, compounding Plaintiff's trauma. Their coordinated efforts reflected a disturbing pattern of sexual predation, emphasizing their complete disregard for her consent, compounded by the manipulative environment Alon crafted through strategic deception. This orchestrated assault exposed Plaintiff to overwhelming physical and psychological harm, forcing her into a state of paralyzing fear and helplessness.

Defendants' actions operated within a carefully constructed scheme designed not only to intimidate but to deter Plaintiff from seeking help or escaping. Tal, another brother, played an active role in the assault; he initiated unwanted sexual contact by forcibly kissing Plaintiff on the mouth, further entrenching her sense of vulnerability. His presence in the apartment was not merely passive; it was a calculated move that created a façade of safety while facilitating the attack. Rather

1  than intervening, Tal's actions served to amplify the pressure on Plaintiff, solidifying the

2  orchestrated nature of the assault and contributing to her helplessness.

3      The dynamics of this assault reflect a deeply ingrained animus toward women, evidenced

4

5  by the premeditated efforts to lure individuals under false pretenses, the use of intoxicants to

6  incapacitate, and the cavalier attitude displayed post-assault. The coordinated actions among the

7  Defendants demonstrate a blatant disregard for the humanity of Plaintiff and exemplify a systemic

8  approach to engage in sexual violence without fear of consequence.

9      Plaintiff's experience is tragically consistent with other reports of Defendants' conduct –

10 revealing a disturbing pattern of sexual predation, coercion, and abuse of power. The allegations

11

12 contained in the Complaint are not "scandalous" – they are truthful and necessary to expose

13 Defendants' modus operandi. Efforts to sanitize or silence these facts through a motion to strike

14 are not only legally unfounded, but they are also a continuation of the very dynamics of silencing

15 and intimidation that this lawsuit seeks to challenge. Likewise, Defendants' statute of limitations

16 argument mischaracterizes the scope and intent of applicable law and disregards the authority of

17 local governments to provide additional avenues of redress for survivors, particularly given the

18
   profound psychological barriers to disclosure that survivors of sexual violence routinely face.
19
   Defendants' motion to dismiss should be denied.
20

21                        **ARGUMENT**

22 **I.  THE COURT SHOULD DENY THE MOTION TO DISMISS**

23           **A.  Legal Standard**

24      In reviewing a motion to dismiss under Rule 12(b)(6), the Court "must construe the

25
   complaint liberally, accepting all factual allegations in the complaint as true, and drawing all
26
   reasonable inferences in the plaintiff's favor." Goldstein v Pataki, 516 F.3d 50, 56 (2d Cir. 2008).
27
28 The complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to

1   relief that is plausible on its face.'" <u>Ashcroft v Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl.</u>

2   <u>Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff

3   pleads factual content that allows a court to draw the reasonable inference that the defendant is

4   liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678.

5

6        "When considering a preemption argument in the context of a motion to dismiss, the factual

7   allegations relevant to preemption must be viewed in the light most favorable to the plaintiff. A

8   district court may find a claim preempted only if the facts alleged in the complaint do not plausibly

9   give rise to a claim not preempted." <u>Galper v. JP Morgan Chase Bank, N.A.</u>, 802 F.3d 437, 444 (2d

10  Cir. 2015).

11

12              **B.  <u>The Victims of Gender-Motivated Violence Protection Law Provides A</u>**
                   **<u>Critical Avenue for Justice</u>**

13        Following the U.S. Supreme Court's decision in <u>United States v. Morrison</u>, 529 U.S. 598

14  (2000)—which struck down critical portions of the Violence Against Women Act ("VAWA")—

15  the New York City Council took bold, decisive action. Refusing to let survivors be left without a

16  remedy, the Council enacted the Victims of Gender-Motivated Violence Protection Law

17  ("VGMVPL") to ensure that those harmed by gender-based violence retained the right to seek

18  justice. <u>N.Y.C. Admin Code. § 10-1102</u>. The VGMVPL provides for a civil cause of action for

19  "any person claiming to be injured by a party who commits, directs, enables, participates in, or

20  conspires in the commission of a crime of violence motivated by gender.  <u>Id</u>. § 10-1104.

21  Importantly, the VGMVPL defines "crime of violence" broadly to include not only acts resulting

22  in criminal prosecution, but also those posing serious risks of harm regardless of whether charges

23  were brought:

24

25

26              An act or series of acts that would constitute a misdemeanor or felony against the person as
                defined in state or federal law or that would constitute a misdemeanor or felony against

27              property as defined in state or federal law if the conduct presents a serious risk of physical
                injury to another, whether or not those acts have actually resulted in criminal charges,

28              prosecution, or conviction.

                                                        8

1    Id. § 10-1103. Recognizing that gender-based violence is often fueled by power, control, and

2    animus, the "crime of violence motivated by gender" is a "crime of violence committed because of

3    gender or on the basis of gender, and due, at least in part, to an animus based on the victim's

4    gender." Id. Survivors are entitled to a full spectrum of relief—compensatory and punitive

5    damages, declaratory and injunctive relief, attorneys' fees, and any other remedy a court finds

6    appropriate. Id. Further, the VGMVPL allowed for actions to be commenced within seven years

7    after the alleged crime of violence motivated by gender. Id. § 10-1105(a).

8

9        In 2022, the City Council again demonstrated its commitment to survivor justice by

10   amending the VGMVPL to revive previously time-barred claims, permitting survivors to file suit

11   between March 1, 2023, and March 1, 2025 – stating:

12

13       Notwithstanding any provision of law that imposes a period of limitation to the contrary,
         any civil claim or cause of action brought under this chapter that is barred because the
14       applicable period of limitations has expired is hereby revived and may be commenced not
         earlier than six months after, and not later than two years and six months after, September
15       1, 2022.

16   City of New York, L.L. 21/2022 § 2. This revival provision reflected the Council's recognition that

17   trauma often delays disclosure, and that justice delayed should not be justice denied. With this

18   provision, the City of New York exercised its authority to ensure that survivors of gender-motivated

19   violence committed within its jurisdiction have a path forward in their pursuit of accountability and

20   healing.

21

22                    C.  **The Child Victims Act and Adult Survivors Act Cannot Plausibly Be
                          Read as Limiting the Protections Provided by the VGMVPL**

23

24       In the years following the enactment of the VGMVPL, New York State took additional

25   historic steps to correct long-standing injustices against survivors of sexual abuse. In 2019, the

26   State Legislature passed the Child Victims Act ("CVA"), creating a revival window for survivors

27   of childhood sexual abuse whose claims had previously been time-barred under outdated statutes

28   of limitations. CPLR § 214-g. The CVA opened a one-year lookback period—later extended due

                                                  9

to the COVID-19 pandemic—allowing survivors previously unable to prosecute their claims to finally assert their rights in court. Id. The CVA window closed on August 14, 2021. Id.

In May 2022, recognizing that adult survivors face similar barriers to disclosure, the State Legislature enacted the Adult Survivors Act ("ASA"), mirroring the CVA in structure and intent. See CPLR § 214-j. The ASA opened a one-year window, from November 2022 to November 2023, for adult survivors to file civil claims that had previously expired under New York's statute of limitations. Id.

Significantly, these laws were not passed quietly—they were accompanied by a resounding legislative mandate that justice delayed should no longer be justice denied. Governor Kathy Hochul, upon signing the ASA, stated:

> Today, we take an important step in empowering survivors across New York to use their voices and hold their abusers accountable. The fight against sexual assault requires us to recognize the impact of trauma within our justice system. I am proud to sign this legislation, which is part of our collective responsibility to protect one another and create an environment that makes survivors feel safe. While our work is not done, eradicating sexual assault begins with our ability to bring the perpetrators of these heinous acts to justice and this legislation is a historic step forward.[1]

Senate Majority Leader Andrea Stewart-Cousins echoed this purpose:

> For too long, our legal system has failed adult survivors and prevented them from accessing true justice. It takes time to come forward, particularly when faced with the trauma that accompanies disclosures. With the Adult Survivors Act, we are saying that we believe you and that you deserve accountability. This powerful legislation is the first of many steps towards better supporting survivors of sexual abuse and ensuring these heinous crimes don't go unpunished.[2]

Assembly Speaker Carl Heastle emphasized:

---

[1] Office of the Governor of New York. "Governor Hochul Signs Adult Survivors Act." New York State, 24 November 2022, https://www.governor.ny.gov/news/governor-hochul-signs-adult-survivors-act.
[2] Id.

10

> The Adult Survivors Act is critical to ensuring that every survivor of sexual abuse is able to have their day in court and experience a sense of justice. This legislation builds on our previous work to deliver justice to survivors of childhood sexual abuse and sends a clear message that perpetrators will be held accountable.[3]

And State Senator Brad Hoylman, the ASA's Senate sponsor, powerfully declared:

> Today is a watershed moment for survivor justice in the State of New York. With Governor Hochul's signature on our Adult Survivors Act, we send a powerful message to sexual abuse survivors: We hear you! We would not be here today without the courage of your convictions that propelled you to share your deeply personal stories about the sexual abuse that upended your lives and made legislative passage possible. Finally, courthouse doors across our state will be flung open so you can confront your abusers and seek the justice that was too long denied you. To the predators who for decades have benefited from New York's prohibitively short statutes of limitations, you know who you are. The Adult Survivors Act will bring you to justice and make New York a safer place for everyone.[4]

These statements were not aspirational—they were promises. Together, the CVA and ASA reflect a broader shift in New York law and policy: a recognition that trauma-informed justice requires extending the time in which survivors can safely come forward. These legislative reforms do not conflict with the VGMVPL, but rather exist alongside it, sharing the same core objective—removing procedural roadblocks that have long silenced survivors.

Defendants' attempt to construe these laws as somehow limiting the right of Plaintiff and other survivors to benefit from the protections provided by the VGMVPL runs directly counter to their express purpose. To adopt that view would be to distort statutes designed to empower survivors into tools of exclusion—an outcome the Legislature never expressed or in any way even suggested.

### D. **The VGMVPL Revival Provision Is a Lawful Exercise of Local Authority and Is Not Preempted by the CVA or ASA**

---

[3] Id.

[4] Id.

11

Under the New York State Constitution's home rule provision, local governments may adopt laws pertaining to the "government, protection, order, conduct, safety, health and well-being of persons or property therein," so long as those laws are not inconsistent with the state constitution or general laws. N.Y. Const., Art. IX § 2(c)(10).

### 1.  Field Preemption Does Not Bar the VGMVPL.

Field preemption exists only where the Legislature has clearly assumed exclusive control over an entire subject area by enacting a comprehensive and detailed regulatory scheme. See Police Benevolent Assn. of the City of New York, Inc. v. City of New York, 40 N.Y.3d 417 (2023); Consolidated Edison Co. v. Town of Red Hook, 60 N.Y.2d 99, 105–06 (1983). Such schemes often feature state-created administrative bodies, investigatory authority, procedural mechanisms, and broad state oversight designed to exclude local participation. Id. New York courts have consistently made clear that such preemption is not lightly inferred and requires more than detailed statutory language—it requires institutional control through regulatory oversight, enforcement authority, or administrative review. Id.

In Doe v. Black, 2024 U.S. Dist. LEXIS 175929, *20 (S.D.N.Y. 2024), the court applied this longstanding and well-established principle to the CVA—a statute nearly identical in structure to the ASA – and held that the CVA's revival provision—even though specific and time-bound—did not amount to the kind of comprehensive and detailed regulatory scheme that would preempt a local statute like the VGMVPL. Id. at 8-20. The court emphasized that the CVA lacked the hallmarks of comprehensive field control, including investigatory or enforcement bodies, administrative mechanisms, or broad institutional mandates.

The Court in Parker v. Alexander, 2025 U.S. Dist. LEXIS 11582 (S.D.N.Y. Jan. 22, 2025), reached a contrary conclusion, finding that the ASA and CVA collectively occupied the field of sexual assault claim revival. While Judge Clarke in Black addressed only the CVA, Judge Kaplan

12

1  in <u>Parker</u>, acknowledged that the ASA and CVA must be analyzed together when evaluating
2  preemption. <u>See id</u>. at 6. This shared analytical framework reinforces that both decisions rest on a
3  common understanding of the relevant statutory architecture—even though they diverge in outcome.
4
5      Plaintiff respectfully submits that the outcome reached by <u>Black</u> court is correct and controls
6  the result in this case. Contrary to <u>Parker</u>'s reasoning, the mere presence of revival windows and
7  applicability to a broad class of claims does not transform a state statute into a comprehensive
8  regulatory scheme that could displace the City of New York's valid exercise of local authority. The
9  ASA and CVA lack the defining features New York courts have required to infer field preemption:
10  they do not establish enforcement bodies, impose local compliance obligations, or create procedures
11  for administrative review. <u>See Hertz Corp. v. City of New York</u>, 80 N.Y.2d 565, 570–71 (1992)
12  (rejecting field preemption where statutes did not reflect intent to regulate the entire field, despite
13  addressing related conduct). The Court of Appeals in <u>Hertz</u> was clear: statutes prohibiting
14  discriminatory practices and regulating certain fees—though detailed—were not so broad as to
15  preclude local laws on related but distinct topics. <u>Hertz</u>, 80 N.Y.2d at 570. That analysis is directly
16  applicable here. Just as the state's regulation of rental car companies in <u>Hertz</u> did not bar the City's
17  law against residence-based surcharges, the ASA's narrow claim revival mechanism does not bar
18  the VGMVPL's broader remedial framework.
19
20      Nor does the ASA's enactment after the VGMVPL compel a different outcome. The
21  Legislature did not amend the ASA to expressly preempt local laws, nor did it give any indication
22  it intended to undermine the City of New York's authority in passing the VGMVPL. Courts have
23  long held that silence from the Legislature, especially where local law exists, weighs against
24  preemption. <u>See New York State Club Ass'n v. City of New York</u>, 69 N.Y.2d 211, 221 (1987)
25  (Legislature's failure to explicitly override local authority is strong evidence against preemption).
26  The <u>Black</u> court properly recognized that the CVA (and by extension the structurally similar ASA)
27
28

13

is a targeted, remedial statute—not a comprehensive regulatory regime. See Black, 2024 U.S. Dist. LEXIS 175929, at 15–20. As a result, the VGMVPL operates in a complementary space—advancing public protection and accountability without intruding on a field the state has claimed as exclusively its own.

Although Parker critiqued how the Black court analogized the CVA to broader regulatory schemes like those governing alcohol, energy siting, and wage setting, the criticism overstated the analogy. See Parker, 2025 U.S. Dist. LEXIS 11582, at 10. Black never claimed that the CVA was a regulatory scheme. Rather, it demonstrated that the absence of regulatory features made it distinct from the types of statutes the Court of Appeals has deemed comprehensive for preemption purposes. Black, 2024 U.S. Dist. LEXIS 175929, at 14-19. The purpose of these comparators in Black was not to assert equivalency in complexity—it was to highlight the necessary hallmarks of field preemption: agency control, institutional oversight, and regulatory permanence. Id. at 15–18. The absence of these elements in the ASA and CVA strongly supports the conclusion that the Legislature did not intend to occupy the field.

## 2. Conflict Preemption Does Not Bar the VGMVPL

Conflict preemption applies only where a local law directly contradicts a state statute or undermines the Legislature's express intent. See People v. Torres, 37 N.Y.3d 256, 268 (2021). Courts are cautioned not to read conflict preemption too broadly, as doing so "carries with it the risk of rendering the power of local governments illusory." Center for Independence of the Disabled v. Metropolitan Transp. Auth., 184 A.D.3d 197, 212 (1st Dep't 2020).

In Black, the court found that the CVA—again, a statute structurally identical to the ASA—did not expressly or impliedly bar local revival provisions, particularly where the statutes shared a common purpose: expanding access to justice for survivors. Id. at 17–20. The Black court emphasized that the CVA's language, including its "notwithstanding" clause, which is also present

14

1  in the ASA, was designed to overcome limitations that existing legislation might otherwise place

2  on the ASA—not to extinguish or limit the reach of duly enacted municipal laws. Id. at 18–19.

3
4      The Parker court found that the VGMVPL revival provision conflicted with the ASA
5  because it opened after the ASA's one-year window began and extended beyond its close. Id. at
6  11–12. Relying on this temporal sequencing and the ASA's use of the phrase "notwithstanding
7  any provision of law which imposes a period of limitation to the contrary," the court inferred that
8  the Legislature intended to create an exclusive revival period for *any* adult survivor seeking justice
9  in New York, regardless of the law under which they proceed. Id. at 7, 11. That interpretation,
10  however, overreads the ASA's text. As Black correctly held, statutory phrases like
11  "notwithstanding any other law" are routinely used to overcome procedural hurdles—not to bar
12
13  municipalities from offering broader or supplementary remedies. Black, at 18. The Court of
14  Appeals has consistently required a clear and express intent to displace local law before finding
15  conflict preemption. See Torres, 37 N.Y.3d at 268. The ASA contains no such intent.

16      The Parker court also asserted that the VGMVPL revival window "forestalled" ASA claims
17  by not opening until March 2023—after the ASA window began. But this mischaracterizes how
18  overlapping statutes function. The ASA and VGMVPL serve different purposes and target different
19  conduct. The ASA revives claims based on specific criminal sexual misconduct under Article 130
20  of the Penal Law. The VGMVPL, by contrast, targets gender-motivated violence more broadly,
21  including non-criminalized or uncharged acts. See N.Y.C. Admin. Code § 10-1103. The fact that
22  Plaintiff's claims might qualify under both does not mean the VGMVPL amendment obstructs the
23  ASA. Importantly, the ASA's legislative history reinforces that its intent was to expand access to
24  justice—not restrict it. When the City Council passed the VGMVPL in 2000, it did so in response
25  to the Supreme Court's decision in *United States v. Morrison*, 529 U.S. 598 (2000), which
26  invalidated portions of VAWA. The Council sought to preserve a civil remedy for gender-based
27
28

15

1    violence within its jurisdiction. See N.Y.C. Admin. Code § 10-1102. The 2022 amendment to the

2    VGMVPL was likewise motivated by a recognition that trauma delays disclosure, and that justice

3    should not be denied to survivors for failing to meet arbitrary deadlines. See City of New York, L.L.

4    21/2022 § 2.

5

6        Statements from state legislators during the ASA's passage further reinforce that it was

7    designed to expand access to justice, not curtail existing rights. Governor Hochul declared that the

8    ASA was about "empowering survivors" and confronting the systemic failures that had silenced

9    them. Similarly, Senate Majority Leader Andrea Stewart-Cousins emphasized that "it takes time to

10   come forward," and the ASA was a message to survivors: "we believe you." These statements—

11   echoed by the Speaker of the Assembly and the ASA's sponsor—underscore a legislative

12   philosophy focused on expanding opportunity for redress. There is no basis to interpret the ASA

13   as extinguishing broader, parallel rights under the VGMVPL.

14

15       Finally, the Appellate Division's decision in Engelman v. Rofe, 194 A.D.3d 26 (1st Dep't

16   2021), confirms the legitimacy of the VGMVPL as a distinct municipal cause of action. The court

17   upheld the VGMVPL's statute of limitations despite state law deadlines for assault and battery

18   claims, affirming that the law was a valid exercise of New York City's authority to address

19   gender-based violence. Id. at 35. Though Engelman predates the 2022 revival amendment, its

20   reasoning applies equally here. The VGMVPL, passed under the City's police power, is designed

21   to protect residents from a unique category of civil rights harm.

22

23       Two federal courts—Doe v. Black and Parker v. Alexander—have weighed in on whether

24   the VGMVPL revival provision is preempted. The court in Black concluded that neither field nor

25   conflict preemption applied, based on a detailed analysis of precedent, legislative purpose, and

26   structural features of the statutes. Parker, while acknowledging this framework, disagreed with

27   Black on the implications of statutory sequencing and textual overlap.

28

1    This Court should adopt the better-reasoned view in <u>Black</u>. The ASA and CVA were

2    enacted to create opportunities for survivors—not to extinguish local options. The VGMVPL

3    revival provision furthers the shared goals of these statutes by enhancing access to justice and

4    reflecting a trauma-informed understanding of delayed disclosure. It does not conflict with state

5    law, but rather complements it. Accordingly, the Court should reject the defense's preemption

6    arguments and allow Plaintiff's claims under the VGMVPL to proceed.

7

8    ### E. The Plaintiff's Complaint is Sufficiently Specific to Survive a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted.

9

10    The phrase "violence against women" has a passive construction; however, it has an active

11    agent – misogyny. The VGMVPL is the result of a legitimate exercise in legislative authority,

12    designed to fill the gaps left behind after the United States Supreme Court struck down the

13    Violence Against Women Act. Defendant Tal asserts that the Plaintiff fails to demonstrate that he

14    enabled or conspired in her assault. To do so, Tal focuses on language in the Complaint which

15    describes him as remaining in the apartment within earshot of the ongoing attack and taking no

16    action to intervene or to assist her.

17

18    While Plaintiff submits to this Honorable Court that Tal's conduct, as highlighted in the

19    Defendants' Motion to Dismiss, is indicative of his clear intent and involvement in the Plaintiff's

20    violent assault, the Complaint makes clear that his role was far from passive. In fact, the

21    Complaint delineates that the Plaintiff's first experience with forced sexual contact was facilitated

22    by Tal when he forcibly kissed her on the mouth upon their introduction. **Exhibit B, ¶21.** This

23    initial violation was not merely an incidental act but part of a coordinated scheme wherein each

24    Defendant played a specific role.

25

26    Furthermore, during the assault, it is asserted that Tal's presence in the apartment was no

27    coincidence, bur rather, a calculated component of the Defendants' conspiracy to facilitate the

28    assault. The Complaint states that Tal "remained in the apartment . . . within earshot of the

17

ongoing attack," demonstrating that his presence established a false sense of safety which enabled the assault to occur. **Exhibit B, ¶ 35.** His deliberate inaction – failing to assist the Plaintiff – was an integral part of a larger strategy aimed at violating her autonomy and facilitating the assault.

Each Defendant's actions were coordinated: Alon's strategic pretense and the explicit predatory patterns as detailed in the Complaint serve to illustrate that this was not an isolated incident but rather a systematic targeting of vulnerable women. **Exhibit B, ¶ 39.** The allegations illustrate a troubling pattern where the brothers leveraged their collective presence to create an environment that normalized sexual predation, implying consent through intimidation and leaving the Plaintiff feeling powerless. **Exhibit B, ¶¶ 30, 32.**

Thus, Tal's alleged conduct, which he minimizes in his Motion to Dismiss, is clearly emblematic of a complicity in the violent acts against the Plaintiff. His participation extended beyond mere presence; it actively facilitated the assault. These averments are not conclusory – they are specific and make clear that this was a coordinated effort to prey upon a vulnerable woman that the Defendants had access to and intoxicated in order to satisfy their selfish sexual desires.

## II. **THE MOVING DEFENDANTS' MOTION TO STRIKE SHOULD BE DENIED**

### A. **Legal Standard**

Motions to strike under Federal Rule of Civil Procedure 12(f) are strongly disfavored and are rarely granted. As courts in this Circuit consistently recognize, such motions should only be allowed where there is a "strong reason for doing so." Winfield v. Citibank, N.A., No. 10 Civ. 7304 (JGK), 2012 WL 266887, at 9 (S.D.N.Y. Jan. 30, 2012); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003) ("[G]enerally, motions to strike are viewed with disfavor and infrequently granted").

1    The movant bears a heavy burden. To prevail, the party must demonstrate that no evidence

2 in support of the allegations would be admissible, that the allegations are entirely irrelevant to the

3 case, and that allowing them to remain would unduly prejudice the movant. <u>Roe v. City of N.Y.</u>,

4 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001). Moreover, the Court must accept the non-moving

5 party's well-pleaded facts as true, draw all reasonable inferences in their favor, and resolve all

6

7 doubts against striking the allegations. <u>Diesel Props S.R.L. v. Greystone Bus. Credit II LLC</u>, No.

8 07 Civ. 9580 (HB), 2008 WL 4833001, at *4 (S.D.N.Y. Nov. 5, 2008). As the Second Circuit has

9 cautioned, courts "should not tamper with the pleadings unless there is a strong reason for so

10 doing." <u>Lipsky v. Commonwealth United Corp.</u>, 551 F.2d 887, 893 (2d Cir. 1976); <u>see also</u> <u>Sloup</u>

11

12 <u>v. Loeffler</u>, No. 05 Civ. 1766 (JFB) (JO), 2006 WL 767869, at *3 (E.D.N.Y. Mar. 13, 2006).

13 **B.  <u>The Challenged Allegations Are Admissible and Highly Relevant</u>**

14    Defendant seeks to strike allegations concerning his own alleged pattern of sexual

15 predation as well as coordinated conduct with others. These efforts fall far short of satisfying the

16 stringent Rule 12(f) standard. To begin with, a plaintiff need not prove the admissibility or even

17 ultimate relevance of allegations at the pleading stage. As <u>Lipsky</u> emphasized, "[o]rdinarily

18

19 neither a district court nor an appellate court should decide to strike a portion of the complaint on

20 the grounds that the material could not possibly be relevant on the sterile field of the pleadings

21 alone." <u>Lipsky</u>, 551 F.2d at 893.

22    Nevertheless, the allegations here are not only facially relevant—they are potentially

23 admissible. Federal Rule of Evidence 415 explicitly provides that in a civil case involving claims

24 of sexual assault, "the court may admit evidence that the party committed any other sexual

25 assault." See also <u>Carroll v. Trump</u>, 660 F. Supp. 3d 196, 201 (S.D.N.Y. 2023). Moreover, the

26

27 challenged allegations support Plaintiff's theory that Defendant acted as part of a pattern and

28 practice of sexual misconduct—a fact that courts in this Circuit routinely recognize as relevant to

19

proving intent, motive, or modus operandi. See Eckhart v. Fox News Network, LLC, No. 20 Civ. 5593 (RA), 2021 WL 4124616, at *26 (S.D.N.Y. Sept. 9, 2021) (allegations of similar misconduct against others, including by anonymous witnesses, were relevant to show a pattern of behavior). Defendants' effort to exclude references to his brothers, who are not named defendants, is also misplaced. These allegations are probative of the overall pattern and context of abuse described in the complaint. They help explain how Defendant allegedly operated, who enabled or collaborated with him, and how power was used to silence victims. Given the public and well-documented nature of these accusations, their inclusion in the pleading is neither scandalous nor unfairly prejudicial.

Finally, Defendant has not shown—nor can he—that the inclusion of these allegations would cause undue prejudice. The potential for discomfort or reputational harm is not, by itself, a basis for striking relevant material from a civil rights complaint—particularly where the allegations are central to Plaintiff's theory of liability. In balancing the probative value of the statements the Defendant seeks to have stricken and the potential prejudice to the Defendant, the Plaintiff fails to see any prejudice that arises from statements with respect to his brothers who, as is widely documented, have been accused by a litany of women of coordinated sexual predation.

## CONCLUSION

For the reasons stated herein, the Plaintiff respectfully requests that this Honorable Court deny the Moving Defendants' Motion in its entirety.

Dated: April 16, 2025

RESPECTFULLY SUBMITTED:

GRUENBERG KELLY DELLA
Michael DellaUniversita, Esq.
700 Koehler Avenue

20

Ronkonkoma, New York 11779
631-737-4110

*Counsel for Plaintiff*